## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |
|---|---|
| **DARIN RUF,** | |
| **Plaintiff,** | Case No. 1:25-cv-00424 |
| **v.** | Judge Douglas R. Cole |
| **THE CINCINNATI REDS, LLC** | Magistrate Judge Karen L. Litkovitz |
| **Defendant.** | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION TO REMAND

Defendant The Cincinnati Reds, LLC (the "Reds"), through counsel, respectfully submits this memorandum in opposition to Plaintiff's Motion to Remand (ECF #11). As set forth in Defendant's Notice of Removal (ECF #1 at PageID 2-4), this Court has subject matter jurisdiction—specifically, federal question jurisdiction—based on the preemption of Plaintiff's claims under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 ("Section 301"). Accordingly, Plaintiff's Motion, which seeks to strip this Court of jurisdiction and remand this action back to state court, should be denied.

## INTRODUCTION

This case is about a professional baseball player who was injured during an official game in the course of his employment in Major League Baseball, which, as Plaintiff concedes, is a professional baseball league in which the terms and conditions of players' employment are governed by two collectively bargained agreements (the "CBAs"), as well as various rules and regulations incorporated therein. Consequently, this case falls under the confines of Section 301 of the LMRA,

which, as Plaintiff also concedes, "converts state common law claims into federal law claims, giving federal courts subject matter jurisdiction over such types of claims." (ECF #11 at PageID 499). Plaintiff's attempt to prevent the conversion of his claims here by simply ignoring the CBAs that lie at the heart of this case is unavailing.

Plaintiff's sole argument for remand is that his claims sound in tort under Ohio law and the CBAs "do not contemplate" state tort claims. (ECF #11 at PageID 499-501). Under Plaintiff's misguided theory, every time a player brings a tort claim, it must be adjudicated in state court. That is plainly not the case, and is directly at odds with well-established preemption law. The Supreme Court has made explicitly clear time and again that, where collective bargaining agreements are implicated, Section 301 preemption applies – including "in a suit alleging liability in tort." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). Indeed, "[t]he preemptive force of § 301 is [so] 'unusually powerful'" that it "'***authoriz[es] removal of actions that [seek] relief only under state law***.'" *Baltrusaitis v. Int'l Union*, 133 F.4th 678, 685 (6th Cir. 2025) (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6-7 (2003)) (emphasis added). Otherwise, the Supreme Court has explained, it would enable claimants to do exactly what Plaintiff is attempting to do here – "elevate form over substance" and "evade the requirements of § 301." *Allis-Chalmers*, 471 U.S. at 211.

As set forth herein, the CBAs are essential to a number of key issues in this case, including the mandatory arbitration of disputes, the determination of the applicable duty of care and any breach thereof in adjudicating potential liability (and contributory fault by Plaintiff), allocation of responsibility for player safety, and assessment of potential damages. Accordingly, because the resolution of Plaintiff's claims substantially implicates, and requires application and interpretation of, the CBAs—and the incorporated rules and regulations—that govern Major League Baseball and

its union employees, including Plaintiff, the claims are preempted by Section 301 and must be adjudicated in federal court.

## FACTUAL BACKGROUND

### A.    The Complaint

The Complaint alleges that, on June 2, 2023, Plaintiff, who was employed as a professional baseball player for the Milwaukee Brewers (the "Brewers"), was injured during a game against the Cincinnati Reds at Great American Ball Park in Cincinnati, Ohio. (Compl. at 2). The injury occurred when Plaintiff, who was playing first base, ran to catch a foul ball and collided with the tarp that was stored along the wall in foul territory. (*Id.*). The Complaint further alleges that there was "no protective cushioning or cap over the end of the tarp roller," which created a "dangerous condition" that was "obscured from view by an advertisement cover." (*Id.*). Plaintiff alleges that he sustained "permanent and substantial deformities to his knee" as a result of the incident. (*Id.* at 2, 4).

The Complaint contains three claims. Claim One for "Common Law Negligence" alleges that the Reds "had a duty to maintain the premises so as to ensure that it was not in a state of disrepair and dangerous," and breached that duty by failing to "take reasonable precautions to keep its premises safe." (*Id.* at 3). Plaintiff also alleges that "Defendant's conduct was reckless." (*Id.*). Claim Two is for "Vicarious Liability" with respect to the "grounds crew," which Plaintiff alleges was responsible for maintaining the tarp roller. (*Id.* at 2-3). Claim Three is for "Negligent Hiring, Training, Supervision, and Retention," which again relates to the grounds crew. (*Id.* at 4).

### B.    The Collective Bargaining Agreements

At the time of the incident, Plaintiff was employed by the Brewers pursuant to the terms and conditions of employment set forth in: (a) the collective bargaining agreement between the Major League Baseball Clubs (including the Brewers and the Reds) and the Major League Baseball Players Association (the "Players Association"), which is referred to as the "2022 – 2026 Basic Agreement"

(the "Basic Agreement");[1] and (b) a collectively-bargained Uniform Player's Contract ("UPC"),[2] which is annexed to and incorporated by reference into the Basic Agreement (*see* Ex. A at 404).[3] These CBAs comprehensively regulate all aspects of players' employment, including but not limited to health and safety, maintenance of safe working conditions, compensation and benefits, medical treatment and rehabilitation, and resolution of disputes via mandatory arbitration.

Notably, the UPC also incorporates "all provisions of the Major League Constitution, and the Major League Rules, or other rules or regulations," and Plaintiff agreed to "accept, abide by and comply with" them pursuant to his UPC. *See* Ex. B at 3, ¶9(a). For purposes of the preemption analysis, the most relevant of these incorporated documents include: (1) the MLB Official Baseball Rules (2023),[4] which is a "code of rules [that] governs the playing of baseball games by professional teams of Major League Baseball" (Ex. C at iii); and (2) the Major League Regulations (2023),[5] which acts as a supplement to other governing documents.

---

[1] The Basic Agreement, which is attached hereto as Exhibit A, is a public document available at: http://www.mlbplayers.com/cba.

[2] The specific UPC executed between Plaintiff and the Brewers, with personal information redacted, is attached hereto as Exhibit B.

[3] In adjudicating a motion to remand, courts are "empowered to review extra-complaint evidence and resolve factual disputes," and are afforded "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1087 n.11 (6th Cir. 2010) (quoting; *see also Parrino v. FHP, Inc*., 146 F.3d 699, 704 (9th Cir. 1998) ("Because complete preemption often applies to complaints drawn to evade federal jurisdiction, a federal court may look beyond the face of the complaint to determine whether the claims alleged as state law causes of action in fact are necessarily federal claims.").

[4] The Official Baseball Rules, which is attached hereto as Exhibit C, is a public document available at: https://www.mlb.com/official-information.

[5] An excerpted and redacted version of the Regulations, which is confidential and not publicly available, is attached hereto as Exhibit D. The relevant sections discussed herein remain unredacted.

<u>**ARGUMENT**</u>

**I. THIS COURT HAS SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFF'S CLAIMS ARE PREEMPTED BY SECTION 301 OF THE LMRA**

**A. Section 301 Preempts Claims Implicating Collective Bargaining Agreements**

Section 301 of the LMRA grants subject matter jurisdiction to federal courts over claims arising under or implicating collective bargaining agreements. *See Livadas v. Bradshaw*, 512 U.S. 107, 121-22 (1994). Section 301 is "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis–Chalmers*, 471 U.S. at 209. The purpose of Section 301 preemption is to prevent conflicting substantive interpretations of collective bargaining agreements and prolonged labor disputes. *See Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962) ("The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.").[6] Because "state law has been completely pre-empted" under Section 301 for claims implicating collective bargaining agreements, "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Local 150, AFL-CIO*, 3 F.4th 866, 872 (6th Cir. 2021) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987)).

Importantly, and contrary to Plaintiff's assertion that preemption is limited to "suits for violation of contracts" (ECF #11 at PageID 500), "[t]he preemptive force of § 301 is far reaching, extend[ing] beyond suits alleging contract violations." *Baltrusaitis*, 133 F.4th at 685 (internal quotation omitted); *see also Adamo Demolition*, 3 F.4th at 872-73 (recognizing that Section 301 has

---

[6] The need for uniformity that animates Section 301 preemption is especially relevant here, where the parties to the CBAs include 30 different Clubs in 17 different states, the District of Columbia, and a Canadian province. *See* Ex. A at 1 (Basic Agreement).

a "necessarily broad reach of preemption in the labor law context," and that "'[i]f the policies that animate § 301 are to be given their proper range,'" then "'the pre-emptive effect of § 301 must extend beyond suits alleging contract violations.'" (quoting *Allis-Chalmers*, 471 U.S. at 210)).

Even where a claim is styled as a state-law tort, if it is dependent on analysis of a collective bargaining agreement, it "must either be treated as § 301 claim [ ] or dismissed as preempted by federal labor-contract law." *Allis-Chalmers*, 471 U.S. at 202, 220 (holding state law claims to be completely preempted where they are "inextricably intertwined with consideration of the terms of the labor contract"); *see also DeCoe v. GMC*, 32 F.3d 212, 216 (6th Cir. 1994) ("Since 1962, the Supreme Court has held that section 301 preempts state law rules that substantially implicate the meaning of collective bargaining agreement terms." (citing *Allis-Chalmers*, 471 U.S. at 210)). In *Allis-Chalmers*, the Supreme Court explained why the preemptive reach of Section 301 extends with equal force to tort claims implicating collective bargaining agreements:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, *whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort*. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 . . . .

*Id.* at 211 (emphasis added).

In accordance with the broad Section 301 framework established by the Supreme Court, the Sixth Circuit—consistent with most other circuits—has "laid out [a] two-step test for determining whether a tort claim is sufficiently intertwined with the meaning of a collective bargaining agreement to make it subject to federal preemption." *Adamo Demolition*, 3 F.4th at 873. "First, the district court must examine whether proof of the state law claim requires interpretation of collective

bargaining agreement terms." *DeCoe*, 32 F.3d at 216.  "Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law." *Id*.

Notably, "if a state-law claim fails *either* of these two requirements, it is preempted by § 301." *Baltrusaitis*, 133 F.4th at 685 (quoting *Mattis v. Massman*, 355 F.3d 902, 906 (6th Cir. 2004)) (emphasis in original).  In other words, "[i]f Plaintiffs' claims require interpretation of the terms of the collective bargaining agreement *or* if the rights claimed by Plaintiffs are created by the collective bargaining agreement, then their claims are completely preempted." *Id.* (emphasis added).  "Thus, state courts may evaluate state law claims 'involving labor-management relations only if such [claims] do not require construing collective-bargaining agreements.'" *DeCoe*, 32 F.3d at 216 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409-10 (1988)).  "But if the claim does require interpretation of the agreement or the agreement created the right, the claim is preempted." *Adamo Demolition*, 3 F.4th at 873.

Finally, courts will not "elevate form over substance and allow parties to evade the requirements of § 301." *Allis-Chalmers*, 471 U.S. at 211.  Plaintiff, therefore, cannot avoid preemption under Section 301 by artfully pleading his claims to avoid referencing or implicating the underlying collective bargaining framework.  *See Adamo Demolition*, 3 F.4th at 873 ("Plaintiffs may not evade preemption by failing to plead 'necessary federal questions.'") (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998)).[7]

---

[7] *See also Sluder v. United Mine Workers of Am.*, 892 F.2d 549 (7th Cir. 1989) ("The plaintiffs cannot escape the application of these principles and deny a defendant his right to a federal forum by artfully disguising an essentially federal law claim in terms of state law." (citation omitted)); *Gore v. TWA*, 210 F.3d 944, 950 (8th Cir. 2000) (finding claims preempted even where "complaint avoid[ed] mention of the collective bargaining agreement," because "it indicate[d] that the actions took place in the course and scope of . . . employment . . . a relationship in fact governed by a collective bargaining agreement[.]"); *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 999 (9th Cir. 1987) ("The key to determining the scope of preemption is not how the complaint is cast, but whether the claims can be resolved only by referring to the terms of the collective bargaining agreement.").

### B. Plaintiff's Claims Are Preempted Because Resolution of the Claims Requires Application and Interpretation of the CBAs

Plaintiff's negligence claims are preempted by Section 301, and are therefore required to be adjudicated in federal court, because they are "substantially dependent" on an analysis of the relevant provisions within, or are otherwise "inextricably intertwined with consideration of the terms of," the CBAs—and the incorporated rules and regulations—that collectively govern the sport and business of professional baseball. *Allis-Chalmers*, 471 U.S. at 213, 220.  Indeed, Plaintiff's claims implicate the CBAs in numerous material respects, all of which independently—and certainly together—mandate preemption in this case.

### 1. The CBAs Contain Dispute Resolution Procedures Requiring Mandatory Arbitration of Claims

In addition to promoting the development of a uniform federal labor law, Section 301 preemption is designed "to assure that agreements to arbitrate grievances [will] be enforced, regardless of the vagaries of state law and lingering hostility toward extrajudicial dispute resolution." *Livadas v. Bradshaw*, 512 U.S. 107, 122 (1994); *see also Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 559 (1968) (Section 301 "was fashioned by Congress to place sanctions behind agreements to arbitrate grievance disputes.").  Parties to collective bargaining agreements are required to exhaust collectively-bargained-for dispute resolution mechanisms before seeking to litigate in court.  *See Allis-Chalmers Corp.*, 471 U.S. at 220 (citation omitted); *see also Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1038-39 (6th Cir. 1989) (holding that the case "should have been dismissed by the district court for failure to exhaust" the "grievance procedures established by the collective bargaining agreement").  Otherwise, allowing "an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness," and would "eviscerate a central

tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Id.*[8]

With respect to Major League Baseball, there are dispute resolution mechanisms mandating that disputes between the various stakeholders in Major League Baseball—including players and Clubs—are subject to arbitration and should not be litigated in court. Specifically, the Basic Agreement contains a comprehensive "Grievance Procedure" requiring the mandatory arbitration of claims to provide for "an orderly and expeditious procedure for the handling and resolving of certain grievances and complaints." *See* Ex. A at 40 (Article XI). Subject to exceptions not applicable in this case,[9] the Grievance Procedure covers all disputes involving "the existence or interpretation of, or compliance with, any agreement, or any provision of any agreement, between the Association and the Clubs or any of them, or between a Player and a Club." *Id.* at 41.

Here, therefore, Plaintiff's claims are necessarily preempted because they are covered by the Grievance Procedure contained in the Basic Agreement, which is designed to resolve disputes between players and clubs where such disputes themselves implicate the CBAs, as Plaintiff's claims do here for the reasons discussed herein (*see infra* Part I.B.2-4). Moreover, even if Plaintiff were to argue that his claims are not so covered, the very fact that a court would be required to interpret the CBAs to resolve that key threshold dispute is itself a separate basis for preemption. This is

---

[8] *See also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653 (1965) (holding that failure to require exhaustion of dispute resolution mechanisms "would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances, and "[i]f a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement," which "would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." (internal quotation omitted)).

[9] The Basic Agreement exempts certain types of claims from the Grievance Procedure, including, for example, disputes involving the Major League Baseball Players Benefit Plans. *See* Ex. A at 41.

especially true in light of the critical role that arbitration regimes play in the Section 301 preemption landscape.  *See Livadas*, 512 U.S. at 122.

### 2. The CBAs Are Essential to Adjudicating the Duty of Care and Breach Determinations for Plaintiff's Negligence Claims

Plaintiff asserts that his claims are mere "common law negligence claims" under Ohio law because the "requisite duty and breach of duty required to prove [the] claims are not established, governed, or even addressed by the plain language of the CBAs."  (ECF #11 at PageID 502).  He argues, therefore, that preemption should not apply in this case because "[t]here is no language in the CBAs that addresses any tort claims for injuries arising from Defendant's failure to maintain the property."  (*Id.* at PageID 501).  Such a narrow application of Section 301 preemption flies in the face of well-established Supreme Court and Sixth Circuit precedent, as discussed *supra*.  It is also nonsensical, as preemption would rarely apply if courts restricted it to circumstances where the specific claims alleged were explicitly contemplated by the relevant collective bargaining agreement.

To the contrary, because "[t]he preemptive force of § 301 is 'unusually powerful,'" it "'authoriz[es] removal of actions that [seek] relief only under state law,'" regardless of how a plaintiff styles his complaint or frames his claims.  *Baltrusaitis*, 133 F.4th at 685 (quoting *Beneficial Nat'l Bank,* 539 U.S. at 6-7).  This includes claims exclusively "alleging liability in tort."  *Allis-Chalmers*, 471 U.S. at 211; *see also Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 (1987) ("[A]n employee's state-law tort action that necessarily rests on an interpretation of those terms [in a collective bargaining agreement] is pre-empted by § 301.").  Put simply, "[i]f Plaintiffs' claims require interpretation of the terms of the collective bargaining agreement," then the claims are "completely preempted" and must remain in federal court.  *Baltrusaitis*, 133 F.4th at 685.

Two recent Sixth Circuit cases, which found preemption exactly on that basis, are instructive here.  In *Adamo Demolition*, the Sixth Circuit, in addition to ruling that tortious interference claims

were preempted, also found that plaintiff's traditional tort claims for injurious falsehoods and defamation were preempted, holding that: "There is simply no way to determine whether these commands were unjustified or defamatory without evaluating the rights and responsibilities of the parties created by the [CBA]." 3 F.4th at 875. Similarly, in *Baltrusaitis v. Int'l Union*, plaintiffs brought "two theories of state-law fraud: silent fraud and fraudulent misrepresentation." 133 F.4th at 686. The Sixth Circuit held that "[b]oth of Plaintiffs' fraud claims require interpreting the terms of the CBA and thus are completely preempted." *Id.*

Here, while Plaintiff ironically attempts to evade preemption by hiding behind the styling of his claims as state-law torts, it is the very fact that his claims are negligence torts that necessitates preemption. This is because the CBAs will be a fundamental and indispensable part of the duty and breach determinations in this case, requiring an understanding of the contractual relationship and obligations between the relevant parties, interpretation of the rules and customs of the game, and adjudication of the reasonableness of any actions taken or not taken by the parties. This includes Plaintiff's assumption of risk and contributory fault in running into the edge of the tarp at a high rate of speed, which will play a central role in this case.[10]

---

[10] Under Ohio law, "the doctrine of primary assumption of the risk" holds that a plaintiff who "voluntarily engaged in a recreational activity or sporting event assumes the inherent risks of that activity and cannot recover for injuries sustained in engaging in the activity unless the defendant acted recklessly or intentionally in causing the injuries." *Schnetz v. Ohio Dep't of Rehab. & Corr.*, 959 N.E.2d 554, 560 (Ohio 10th Dist. 2011). "Primary assumption of the risk completely negates a negligence claim because the defendant owes no duty to protect the plaintiff against the inherent risks of the recreational activity in which the plaintiff engages." *Id.* Separately, contributory fault—otherwise known as contributory negligence or implied assumption of risk—applies where "defendant owed the plaintiff some duty," but plaintiff's conduct was "unreasonable" or without "ordinary care," such that plaintiff is held to have contributed to the alleged injury. *Williams v. 312 Walnut P'ship*, 1996 WL 741982, at *8 (Ohio Ct. App. Dec. 31, 1996) (citations omitted). "The contributory negligence of a plaintiff is a complete defense to defendants' negligence where the plaintiff's negligence is clearly greater than the combined negligence of the defendants." *Id.* at *9 (citations omitted). Even if it is determined that a plaintiff's comparative level of fault was less than 50%, the court must still "diminish any compensatory damages recoverable by the plaintiff by an

In his Complaint, Plaintiff repeatedly alleges that Defendant had certain duties, including the "duty to maintain the premises so as to ensure that it was not in a state of disrepair and dangerous." (Compl. ¶ 15). The Complaint also makes several allegations relating to the question of breach, alleging that Defendant "did not take reasonable precautions to keep its premises safe," that "Defendant breached its duty by failing to maintain the premises," and that Defendant's "conduct was reckless and caused significant injury to Plaintiff." (*Id.*).

These allegations necessarily implicate the CBAs in several key respects. What makes a professional baseball field "safe" and "maintained," including how a tarp is positioned and stored, clearly depends on the rules, regulations, and customs of the sport. Likewise, the reasonableness of Plaintiff's actions during the incident can only be analyzed through the prism of the sport, implicating the same rules, regulations, and customs. *See Jones v. Gen. Motors Corp.*, 939 F.2d 380, 383 (6th Cir. 1991) (recognizing that Section 301 "pre-empts state law . . . when a state-based claim requires examining the practices and customs of a workplace whose conditions are governed by a CBA") (citing *Ulrich v. Goodyear Tire & Rubber Co.*, 884 F.2d 936 (6th Cir. 1989)).[11]

For example, the Official Baseball Rules for Major League Baseball, which are incorporated into the CBAs, make clear that a player is permitted to attempt to make a catch in foul territory in the vicinity or on top of various obstructions—including tarps, fences, railing, and ropes—but the player "does so at his own risk." Ex. C at 42 (Commentary to Rule 5.09). That is directly relevant to Plaintiff's negligence claims and must also be considered when assessing Plaintiff's assumption of

---

amount that is proportionately equal to the percentage of tortious conduct of the plaintiff." Ohio Rev. Code Ann. § 2315.33.

[11] *See also*, *e.g.*, *Barbo v. Kroger Co.*, 2007 WL 2350181, at *2-3 (W.D. Ky. Aug. 13, 2007) ("Plaintiffs' claims include invasion of privacy and intentional infliction of emotional distress. The elements of both these claims will require us to interpret the CBA. . . . [W]e must look to the CBA to determine whether Kroger invaded Plaintiffs' privacy by employing a method that is *objectionable to the reasonable person, which in this case is a union member operating under the CBA*. . . . We conclude that Section 301 preemption applies in this case.") (emphasis added).

risk and contributory fault. As another example, the "Universal Ground Rules" contained in the Major League Regulations, which is also incorporated in the CBAs, not only contemplates tarps being stored on the field during games, but also specifically permits players to make catch attempts on top of—as opposed to running into—the tarp. *See* Ex. D at 19 ("A catch may be made on the field tarpaulin."); *see also id.* ("A ball lodging behind or under canvas on a field tarpaulin is out of play."; "A ball striking the field tarpaulin and rebounding onto the playing field is in play.").

Also relevant is the fact that the Major League Regulations prohibit teams from bringing "chairs, stools, benches, or any equipment, bags, or coolers onto the field of play during the progress of a game" because it "can raise interference and safety concerns when players enter these areas to retrieve thrown or batted balls." Ex. D at 10. Yet the regulations do not prohibit the storage of tarps on the field during games due to any safety concerns, nor do they contain any requirements regarding how the tarp should be stored. On the contrary, as discussed above, tarps have been stored on the field for decades, and the rules and regulations treat tarps as being part of the field of play (albeit in foul territory).

Interpreting these rules and regulations, in the context of industry practice and the larger framework created by the CBAs, is necessary to define not only the scope of any duty Defendant owed Plaintiff and whether there was any breach of that duty, but also Plaintiff's assumption of risk and contributory fault. A recent decision out of California is instructive. In *Patrick v. NFL*, the court explained that the "[t]he risk of injury arising from collision with objects on the sidelines is an inherent risk of professional football, whether those objects are other players or team staff, benches, coolers, camera equipment, or audiovisual equipment with their attendant cables and cords." 2023

13

WL 6162672, at *5 (C.D. Cal. Sep. 21, 2023).[12]  The court ultimately ruled that preemption was warranted because, "[w]hether considering the premises liability claim against the Chargers or the ordinary negligence claim against both Defendants, any duty that Defendants owed to Patrick appears to arise not from state law but is inextricably intertwined with Defendants' duties and obligations under the CBA."  *Id.*[13]

In sum, application and interpretation of the official rules, regulations, and customs that govern the sport of professional baseball is not only critical in adjudicating Plaintiff's negligence claims – it is inescapable.  And because those rules and regulations are only effectuated and enforced through the CBAs, Plaintiff's claims are necessarily preempted under Section 301.

### 3. Oversight and Disputes Relating to Player Safety and Health Are Also Covered by the CBAs

Plaintiff's attempt to carve out his claims from the broad reach of Section 301 preemption also includes narrowly framing the nature of this case as involving nothing more than baseball field maintenance, which Plaintiff asserts is not covered or contemplated by the CBAs.  (ECF #11 at PageID 501-02).  In reality, however, Plaintiff's allegations are about player safety, including working conditions on the field during baseball games.  Through the Basic Agreement framework, the Clubs and the Players Association expressly delegated responsibility for such issues to a "bipartisan Safety and Health Advisory Committee" (the "Safety Committee").  The Committee is charged with "engag[ing] in review of, planning for and maintenance of safe and healthful working

---

[12] *See also, e.g.*, *Yarber v. Oakland Unified Sch. Dist.*, 4 Cal. App. 4th 1516, 1520, 6 Cal. Rptr. 2d 437 (1992) (concluding as a matter of law that "the risk of injury is not confined to the boundaries of the [basketball] court . . . Running into obstacles close to the sidelines must be considered an inherent risk of the game.").

[13] *See also*, *e.g.*, *Stringer v. NFL*, 474 F. Supp. 2d 894, 910 (S.D. Ohio 2007) (explaining that "the degree of care owed cannot be considered in a vacuum," and ultimately holding that the claims were preempted because "[t]he degree of care owed by the NFL . . ., and what was reasonable under the circumstances, must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players").

conditions for Players," as well as "deal[ing] with emergency safety and health problems as they arise, and attempt[ing] to find solutions." *See* Ex. A at 55 (Basic Agreement, Article XIII(A)(1)(b)). In other words, the Safety Committee is responsible for proactively planning for and maintaining a safe working environment for players.

The existence and operation of the Safety Committee is directly relevant to the analysis of Plaintiff's claims here. Specifically, the Safety Committee had the authority and responsibility to determine whether the storage of tarps on the field in foul territory—which, for decades, has been the tarp storage location in nearly all ballparks—and the manner of that storage (including potential padding) gave rise to any potential player safety issues. Such delegation of responsibility to the Safety Committee is of critical importance in this case, as it impacts the determination and adjudication of whether and to what extent Defendant may have had a parallel duty regarding player safety issues, the nature of any such duty in light of the Safety Committee, and to what extent Defendant could have reasonably relied on guidance from and oversight by the Safety Committee.

Moreover, in addition to the Safety Committee, the CBAs also provide other constituent avenues for issues dealing with player safety and health. For example, the Basic Agreement grants the Players Association the power to "file and pursue through arbitration a grievance concerning safety and health." Ex. A at 56 (Basic Agreement, Article XIII(A)(4)). It also requires the Commissioner's Office to investigate health and safety issues in certain situations. *Id.* (Basic Agreement, Article XIII(B)). As such, determining whether Defendant was negligent would further require this Court to adjudicate whether the allocation of safety responsibilities to other actors affected the degree of care that was owed to Plaintiff, as well as the reasonableness of actions taken or not taken by both parties.

At bottom, because the CBAs make clear that player safety—including the duty to maintain safe field conditions during games—is part of the collectively-bargained framework governing professional baseball, Plaintiff's claims implicating the same are necessarily preempted by Section 301. And at a minimum, the mere fact that resolving such questions requires interpretation of the CBAs, including the operation of the Safety Committee, triggers Section 301 preemption.

### 4. Ascertaining Plaintiff's Damages Further Implicates the CBAs

In his Complaint, Plaintiff seeks to be "fully compensated for his injuries and damages." (Compl. ¶ 20). While the Complaint does not specify the nature or extent of the alleged damages, Plaintiff is presumably seeking damages for lost earnings—both past and future—as well as medical expenses and other costs flowing from the injury. However, under what circumstances and to what extent Plaintiff may be entitled to such damages—including salary following a work-related injury, medical and rehabilitation expenses, and related costs—and any applicable offsetting cannot be determined without analysis of multiple provisions contained in the CBAs.

For example, Regulation 2 of the UPC contains provisions regarding when players are entitled to receive salary or payment of medical expenses in the event of a work-related injury, and the accounting for any "workmen's compensation" payments. *See* Ex. B at 7, ¶ 2.[14] Likewise, the Basic Agreement also contains provisions dealing with injury-related compensation and rehabilitation expenses. *See* Ex. A at 31-32, 37. Furthermore, both the UPC and the Basic Agreement contain various contract rules related to salary, establish the minimum compensation rate for all Major League players, and set Plaintiff's compensation during the year he was injured, all of

---

[14] Regulation 2 states, in pertinent part: "Disability directly resulting from injury sustained in the course and within the scope of his employment under this contract shall not impair the right of the Player to receive his full salary for the period of such disability or for the season in which the injury was sustained (whichever period is shorter), together with the reasonable medical and hospital expenses incurred by reason of the injury and during the term of this contract or for a period of up to two years from the date of initial treatment for such injury, whichever period is longer . . . ."). *Id.*

which will play an integral part of any damages calculation in this case.[15] Ex. A at 11-16 (Basic Agreement, Article VI – Salaries); Ex. B at 5 (UPC, Compensation and Payment Schedule).

These and other related provisions in the CBAs must be applied and interpreted in both evaluating whether Plaintiff is entitled to the specific types of damages he seeks in this action, and in calculating any such damages. Accordingly, Plaintiff's claims are preempted on this basis as well.

## C. Plaintiff's Authorities Do Not Alter the Jurisdictional Analysis

Plaintiff cites two examples where courts concluded that the specific claims at issue were not preempted under Section 301. (ECF #11 at PageID 501). But both cases are largely inapposite because the rulings were based on dispositive factors that are not applicable here and, in any event, do not undermine the multitude of CBA-related issues requiring preemption in the present case.

First, in *Bush v. St. Louis Reg'l Convention & Sports Complex Auth.*, a professional football player filed suit for an injury sustained during a game when he slipped on concrete after running out of bounds. *See* 2016 WL 3125869, at *1 (E.D. Mo. June 3, 2016). The court acknowledged that "Section 301 completely preempts state law claims that are substantially dependent upon analysis of a CBA . . . because the application of state law might lead to inconsistent results since there could be as many state law principles as there are States." *Id.* at *2 (internal quotations omitted). The court ultimately ruled, however, that preemption did not apply in that case because all but one of the contract provisions raised by the defendant did not even apply to plaintiff's claims. *Id.* at *4. The court held that the remaining provision relating to an NFL safety committee, which the court

---

[15] MLB's online player profile for Plaintiff indicates that, coming off an unrelated injury, he was signed by the Brewers as a free agent on May 15, 2023. *See* MLB Player Transactions for Darin Ruf, *available at* https://www.milb.com/player/darin-ruf-573131. He was immediately placed on the 10-day injured list following his knee injury on June 3, and then moved to the 60-day injured list on June 5. *See id.* Three months later, on September 12, 2023, Plaintiff began a rehab assignment with the Brewers' AAA affiliate, the Nashville Sounds, but subsequently elected free agency again on November 2, 2023. *See id.*

considered to be the "strongest argument," did not by itself rise to the level of "substantial dependence upon an analysis of the CBA" for preemption purposes because the NFL committee was charged with merely "discussing" certain "player safety and welfare aspects" and, in contrast to the MLB Safety Committee here, did not have mandatory authority to make recommendations and persuade stakeholders regarding potential safety measures.[16] *Id.* at *3-5.

Second, in *Williamson v. China Basin Ballpark Co. LLC*, a professional baseball player suffered a concussion when he tripped over a bullpen mound during a game. *See* 2021 WL 11669479, at *1 (N.D. Cal. July 28, 2021). The court rejected all but one of defendant's arguments for preemption on the basis that, unlike here, plaintiff sued the owner of the ballpark rather than the actual baseball team, so the CBAs did not apply. *See id.* at *6-7. The remaining argument for preemption related to the safety of the bullpen placement on the field, where the court reasoned that resolving that issue only required analysis of the MLB rules, not the CBAs. *Id.* at *7. Respectfully, the court's decision failed to account for the fact that the MLB rules and regulations are explicitly incorporated into the CBAs, the effect of which is to make them part of the collectively bargained framework. *See Adamo Demolition Co.*, 439 F. Supp. 3d at 943 (finding preemption of tort claim based, in part, on the need to interpret documents incorporated into the collective bargaining agreement).[17] Thus, preemption under Section 301 is required if the rules and regulations are substantially implicated. *See Allis-Chalmers Corp.*, 471 U.S. at 220.[18]

---

[16] Whereas the NFL committee "may" discuss and make recommendations on whatever safety topics it chooses to examine (*id.* at *3), the MLB's Safety Committee is *required* to address and make recommendations regarding safe working conditions for players and emergency safety issues, and must also use "best efforts" to persuade stakeholders. *See* Ex. A at 55-56 ("The Safety and Health Advisory Committee shall make recommendations to the Parties as to the solution of problems and the establishment of policies. The Committee shall use its best efforts to persuade the Parties to adopt the Committee's recommendations.").

[17] *See also Rhoades v. United States*, 953 F. Supp. 203, 207 (S.D. Ohio 1996) (finding preemption of tort claim based the implication of various documents that were incorporated into the

## II. PLAINTIFF WOULD NOT BE ENTITLED TO AN AWARD OF COSTS IN THE EVENT OF A REMAND

Plaintiff's motion seeks attorney's fees and expenses, arguing that Defendant's removal was "improper." (ECF #11 at PageID 502). Plaintiff's request is meritless and itself improper, as it ignores the well-established standard for awarding costs related to removal. "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Paul v. Kaiser Found. Health Plan of Ohio*, 701 F.3d 514, 523 (6th Cir. 2012) (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005)); *see also A Forever Recovery, Inc. v. Twp. of Pennfield*, 606 F. App'x 279, 280 (6th Cir. 2015) ("As a general rule, the award of fees is inappropriate if the removing party had 'an objectively reasonable basis for seeking removal.'" (quoting *Martin*, 546 U.S. at 141)).

Here, Defendant's removal was clearly proper because, for the reasons discussed above, this Court has subject matter jurisdiction based on the federal preemption of Plaintiff's claims. But even if the Court determines that remand is appropriate, Plaintiff provides no basis—because there is no basis—to conclude that Defendant's removal was objectively unreasonable. *See Hutson v. Capital One, N.A.*, 2025 WL 1671953, at *3 (E.D. Tenn. June 12, 2025) ("[I]t would distort Section 1447(c)'s purpose to award costs where a defendant had a reasonable, but ultimately inaccurate, belief that a case was removeable."). Accordingly, a cost award would not be warranted in the event of a remand.

---

relevant CBA); *Patrick*, 2023 WL 6162672, at *3 (holding that, even though the NFL Field Services Manual was not explicitly incorporated into the CBA, it was intended to be and could therefore serve as a basis for preemption under Section 301 if implicated by plaintiff's claims).

[18] Upon remand, the state court in the *Williamson* case granted defendant's motion to compel arbitration under the CBA's grievance procedure, disagreeing with the decision of the federal district court on that key issue. *See* Order Granting Motion to Compel Arbitration, *Williamson v. China Basin Ballpark Co., LLC*, Case No. CGC-20-587701 (Cal. Super. Ct. Jan. 19, 2022) (attached hereto as Exhibit E).

## **CONCLUSION**

For the reasons set forth above and in the Notice of Removal, because this Court has subject matter jurisdiction based on federal question preemption under Section 301 of the LMRA, Plaintiff's Motion to Remand should be denied.

Date: August 13, 2025

Respectfully submitted,

/s/ Jeffrey P. Hinebaugh

Jeffrey P. Hinebaugh (0059888)
DINSMORE & SHOHL LLP
255 E. Fifth St., Suite 1900
Cincinnati, OH 45202
(513) 977-8200
(513) 977-8141 (fax)
jeff.hinebaugh@dinsmore.com

*Trial Attorney for Defendant Cincinnati Reds*

Shawn P. Davisson (*pro hac vice*)
DINSMORE & SHOHL LLP
801 Pennsylvania Avenue N.W., Suite 610
Washington, D.C. 20004
(202) 372-9100
(202) 372-9141 (fax)
shawn.davisson@dinsmore.com

*Counsel for Defendant Cincinnati Reds*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 13, 2025, a copy of the foregoing document was served on all

parties of record via the court's electronic filing system.

/s/ Jeffrey P. Hinebaugh
Jeffrey P. Hinebaugh (0059888)
DINSMORE & SHOHL LLP
255 E. Fifth St., Suite 1900
Cincinnati, OH 45202
(513) 977-8200
(513) 977-8141 (fax)
jeff.hinebaugh@dinsmore.com

*Trial Attorney for Defendant Cincinnati Reds*